JEAN B. CRESENCIA, JULIANA A. CRESENCIA, CANDIDA B. CRESENCIA, PERLA C. GAMBOA, EMMA B. CRESENCIA, VERONICA B. CRESENCIA, MANUEL B. CRESENCIA, Plaintiffs–Appellees, v. ROBERT Y. H. KIM, SR., and REBECCA B. KIM, Defendants–Appellants, and ROBERT M. TAKEUCHI and MALIA ENTERPRISES, Defendants

NO. 15593

(CIV. NO. 78727)

AUGUST 2, 1994

BURNS, C.J., HEEN, AND WATANABE, JJ.

462

## OPINION OF THE COURT BY WATANABE, J.

This appeal involves a dispute over a sub–agreement of sale, by which Plaintiffs–Appellees Jean B. Cresencia (Jean), Juliana A. Cresencia (Juliana), Candida B. Cresencia, Perla C. Gamboa, Emma B. Cresencia, Veronica B. Cresencia, and Manuel B. Cresencia (collectively, Cresencias) purchased from Defendants–Appellants Robert Y. H. Kim, Sr. (Kim Sr.) and Rebecca

B. Kim (collectively, Kims) a 5.307–acre parcel of land in Kalihi Valley, Hawaiʻi (subject property).

The Cresencias, who are all related by blood or marriage, had purchased the subject property with the intention of building several houses on it, so they could all live next to each other. Several months after the purchase, however, they discovered that the subject property had been downzoned by the City and County of Honolulu (County) to P1–Preservation land and could no longer be used for their intended purposes. Additionally, the Cresencias learned, when they were named as defendants in a foreclosure lawsuit, that the Kims had defaulted on their master agreement of sale for the subject property and were thus in jeopardy of forfeiting their interest in the subject property.

The Cresencias thereafter ceased making payments under the sub–agreement and filed this lawsuit against the Kims for breach of contract and fraud. After a jury–waived trial, the Cresencias were awarded $156,646.50 in breach of contract damages, interest, attorneys' fees, and costs, as well as emotional distress damages totaling $135,000.[1] Additionally, a deficiency judgment that had earlier been entered in favor of the Kims on their counter-claim against the Cresencias was vacated.

The Kims timely appealed the circuit court's judgment, as well as numerous orders entered by the circuit court, arguing that: (1) the circuit court improperly concluded that the Kims had breached the sub–agreement by defaulting on their master agreement of sale; (2) the cir-

---

[1] Although the circuit court found and concluded that the Kims were liable for fraud, the court did not award any damages specifically for fraud.

cuit court erroneously concluded that fraud had been proved; (3) the circuit court should not have imputed the fraudulent conduct of the Kims' son, Robert Y. H. Kim Jr. (Kim Jr.), to the Kims; (4) the circuit court improperly awarded the Cresencias damages for emotional distress, since the Cresencias neither pleaded nor tried the issue of emotional distress damages; (5) the circuit court should not have awarded damages on both the fraud and breach of contract counts since that action was tantamount to giving the Cresencias a double recovery; (6) the circuit court improperly vacated the deficiency judgment previously entered against the Cresencias; and (7) the circuit court had no authority to order that if the deficiency judgment against the Cresencias were confirmed by an appellate court, the Cresencias were entitled to an award of damages equal to the amount of the deficiency judgment.

We conclude that the award of emotional distress damages to the Cresencias was improper in this case and, accordingly, vacate said award. In all other respects, we affirm the joint and several judgment and the remaining orders from which this appeal was taken.

## BACKGROUND

On April 29, 1981, the Kims and Spectrum Properties, Inc. (Spectrum) entered into an Agreement of Sale (Master Agreement) to purchase the subject property for $170,000 from Robert Takeuchi (Takeuchi) and Malia Enterprises (Malia), a Hawai'i limited partnership. Kim Jr., who was Spectrum's president and major shareholder, signed the Master Agreement on behalf of the Kims and Spectrum.

Kim Jr. indicated that the subject property was initially acquired with the intention of subdividing and developing it. Deposition (Depo.) Kim Jr. 11/21/86, at 14.[2] However, these plans were abandoned when the County Board of Water Supply, because of water restrictions in the Kalihi Valley area, refused to allow water service to more than one single–family residential unit on the subject property. *Id.* at 15–17.

Kim Sr., on the other hand, testified that he learned from Kim Jr. about the water restrictions on the subject property prior to its purchase. He nevertheless went ahead with the purchase, hoping that the water situation might subsequently change, allowing the subject property to be subdivided and developed. Transcript (Tr.) 7/3/91, at 140–51.

Shortly after purchasing the subject property, the Kims and Spectrum fell behind on their payments. After Takeuchi complained in a letter about the constant late payments, the Kims and Spectrum began a search for another buyer for the subject property. Since Kim Jr. was a licensed real estate broker, the Kims gave him full authority to advertise and negotiate the terms for the sale of the subject property, subject to their final approval.

Kim Jr. subsequently placed an advertisement for the sale of the subject property in the local newspapers, and listed the subject property with The Investment Group, Realtors (TIGR) Listing Service and the Honolulu Board of Realtors Multiple Listing Service. The TIGR property

---

[2] Due to Kim Jr.'s death prior to trial, the parties agreed to admit the transcripts of Kim Jr.'s three depositions into evidence at trial, except that the Kims objected to the admission of any references in the transcripts to the water issue. The trial court sustained the Kim's objection. Transcript (Tr.) 7/5/91, at 7.

listing stated that the subject property was "broker owned," and that the owner no longer wanted the subject property because of a "change of plans." Plaintiffs' Exhibit 28. The listing also noted that a "house, condos services" could be added to the subject property and that it was "possible to develop" the subject property. *Id.*

After reading the newspaper advertisement in early 1982, Jean, along with his brother, Amor (Amor), met with Kim Jr. and indicated the Cresencias' interest in buying a parcel of land on which several houses could be built, so they could all live next to each other. Although Kim Jr. claimed that he advised the two brothers about the water restrictions on the subject property, Depo. Kim Jr. 11/21/86, at 31, Jean and Amor both testified that on more than one occasion, Kim Jr. represented that several houses could be built on the subject property and the remaining area could be farmed, since 1.3 acres of the subject property were zoned as R4–Residential (R4) and 4 acres were zoned as P1–Preservation (P1).

Jean further testified that Kim Jr. stated that he was a licensed realtor who could represent the Cresencias' interests, and that it was therefore unnecessary for the Cresencias to obtain the services of an attorney or another broker in order to negotiate and close the sale of the subject property. Tr. 7/2/91, at 62–63.

Jean subsequently contacted personnel at the County to confirm the zoning of the subject property and to determine what the R4 and P1 zoning classifications meant. He was informed that one residence per 7,500–square–foot lot could be built on land zoned R4 and one residence could be built on land zoned P1. He therefore calculated that a total of seven houses could be built on the subject property — six on the R4 land and one on the P1 land.

On March 6, 1982, the Cresencias executed a standard Deposit, Receipt, Offer, and Acceptance document (DROA), offering to purchase the subject property for $210,000 by a sub–agreement of sale. The DROA, which contained no representations about the number of houses that could be built on the subject property, was accepted by Kim Jr. on behalf of the Kims and Spectrum that same day.

One week after the execution of the DROA, the County Planning Commission published a legal notice inviting public comment and testimony on a proposed bill to "ADOPT ZONING MAP NO. 5, KALIHI NU['JUANU, CITY AND COUNTY OF HONOLULU." Record on Appeal (R.A.) vol. 1, at 354. The bill, which was ultimately passed by the County Council and signed into law by the County mayor on December 23, 1982, sought to downzone the residential portion of the subject property to park use.

In April 1982, before any written agreement between the parties was signed, the Cresencias, anxious to obtain access to the subject property, obtained Kim Jr.'s approval to begin making monthly payments of $1,300 directly to Spectrum. The Cresencias then purchased tools, built fences on the subject property, and began to manually clear the subject property of large trees, bushes, tall grass, and boulders.

The parties formally executed a written Sub–Agreement of Sale (Sub–Agreement) on June 29, 1982, and, pursuant thereto, the Cresencias paid the Kims and Spectrum a down payment of $30,000 and agreed to pay $1,300 each month for the period beginning April 1, 1982 and ending April 29, 1987. The Cresencias also agreed to pay the Kims and Spectrum, no later than April 29, 1984, a balloon payment of $130,000, as well as the balance of

any accrued interest, and to pay the balance of the principal no later than April 29, 1987.

The Sub–Agreement, which Kim Jr. signed on Spectrum's behalf, was made subject to the Master Agreement and required the Kims and Spectrum to stay current on their payments to Takeuchi and Malia. The Cresencias were never informed, however, that the Kims and Spectrum were already delinquent under the Master Agreement when the Sub–Agreement was signed.

Spectrum subsequently assigned its entire interest in the subject property to the Kims. The Cresencias, however, with the express or implied authority of the Kims, continued to regularly send their monthly payments to Spectrum.

On April 15, 1983, Takeuchi and Malia filed a foreclosure action against the Cresencias, the Kims, and Spectrum, but not Kim Jr. (Takeuchi Foreclosure Lawsuit), alleging that the Kims and Spectrum were in default under the Master Agreement for failure to make their March and April 1983 payments. Takeuchi and Malia were granted summary judgment and a decree of foreclosure in the case, but subsequently entered into a settlement agreement with the Kims, agreeing to dismiss the lawsuit without prejudice, based on the Kims' promise to make full payment under the Master Agreement by March 31, 1985 and to secure such payment by taking out a third mortgage on another parcel of real property owned by the Kims.

In May 1983, the Cresencias applied for a building permit to begin construction of a house on the subject property. When their application was denied on the basis of the new zoning restrictions, the Cresencias learned, for

the first time, that the subject property had been downzoned.

The Cresencias ceased making payments under the Sub–Agreement after July 6, 1983, and on July 29, 1983, filed the instant action against the Kims, Kim Jr., Spectrum, Takeuchi, and Malia. Kim Jr., Spectrum, Takeuchi, and Malia were subsequently dismissed from the lawsuit,[3] however, and trial proceeded only against the Kims.

The Kims conducted an investigation into the downzoning of the subject property, and on February 25, 1985, due to their efforts, the subject property was rezoned back to its original status. However, the Cresencias were no longer interested in the subject property.

## PROCEDURAL HISTORY

The Cresencias' Complaint alleged two separate causes of action. Count I stated a breach of contract claim arising out of the Kims' default on the Master Agreement and the resultant foreclosure action instituted by Takeuchi and Malia against the subject property. Count II asserted a fraud claim based on the downzoning of the subject property.

Because the Cresencias had ceased making monthly payments under the Sub–Agreement, the Kims filed a counterclaim against the Cresencias, alleging that the Cresencias' default and breach of the Sub–Agreement had

---

[3] The circuit court granted Takeuchi's and Malia's motion to dismiss by an order dated March 9, 1984. Following Kim Jr.'s death and Spectrum's involuntary dissolution by the State of Hawai'i Director of Commerce and Consumer Affairs, the circuit court also dismissed Kim Jr. and Spectrum from the lawsuit.

caused the Kims to breach the Master Agreement and sustain $500,000 in damages.

On January 31, 1985, in a related case (Civil No. 85–0444), Liberty Bank filed a complaint against the Kims, Spectrum, Takeuchi, and Malia, as defendants, seeking to foreclose on Takeuchi's and Malia's underlying mortgage on the subject property. Takeuchi and Malia cross–claimed against the Kims and Spectrum, alleging that the latter failed to make payment pursuant to the settlement agreement in the Takeuchi Foreclosure Lawsuit.

On September 4, 1985, the Kims filed a Motion for Default Judgment, Summary Judgment, and Interlocutory Decree of Foreclosure on their counterclaim against the Cresencias in the instant case. Liberty Bank filed a similar motion in Civil No. 85–0444, and both motions were heard by the circuit court in a consolidated hearing on September 23, 1985. The Cresencias did not contest either motion, and the circuit court granted both motions and ordered the sale of the subject property.

When the sale failed to yield a sum sufficient to pay off the underlying mortgage, the circuit court awarded the Kims a Joint and Several Deficiency Judgment (Deficiency Judgment) against the Cresencias for $167,042.66, plus interest. R.A. vol. 3, at 160–61.

A circuit court judge subsequently dismissed the Cresencias' Complaint on grounds that the decree of foreclosure entered against them on the Kims' counterclaim barred prosecution of their claims. The Cresencias appealed, and the Hawai'i Supreme Court, in *Cresencia v. Kim*, No. 12801 (memo op. March 9, 1989), concluded that the decree of foreclosure had not determined the merits of the Cresencias' claims and, accordingly, vacated

the order of dismissal and remanded the case for further proceedings.

On remand, the circuit court, in view of the supreme court's reinstatement of the Cresencias' claims, vacated the Deficiency Judgment that had been previously entered against the Cresencias. R.A. vol. 4, at 348–50. After a bench trial, the circuit court entered judgment in favor of the Cresencias and awarded them a total of $291,646.50 in damages for breach of contract, pre–judgment interest, attorneys' fees and costs, reimbursement for expenses, and emotional distress. The circuit court also ordered that if an appellate court confirmed the $167,042.66 Deficiency Judgment against the Cresencias, the Cresencias would be awarded an identical sum against the Kims.

This timely appeal followed.

## DISCUSSION
### I.
### *The Breach of the Sub–Agreement by the Kims*

The Kims maintain that there was insufficient evidence to support a finding that they were in breach of the Sub–Agreement. We disagree.

The Hawai'i Supreme Court previously determined that "[the Kims] were already in default of their [M]aster [A]greement when they executed the [Sub–Agreement] on June 29, 1982." *Cresencia v. Kim*, No. 12801, memo op. at 6. Furthermore, it is undisputed that even after the Kims had entered into the Sub–Agreement, they continued to make late payments under the Master Agreement, thus prompting the Takeuchi Foreclosure Lawsuit. The record thus supports the trial court's finding that the Kims breached their obligation under the Sub–Agreement

to keep their payments under the Master Agreement current.

## II.
### *The Fraud Issue*

When the Cresencias filed their Complaint, they based their fraud cause of action on the downzoning of the subject property after they purchased it. After conducting discovery, however, and learning that both the Kims and Kim Jr. had been aware of the water restrictions on the subject property prior to the Cresencias' purchase of the property, the Cresencias filed a Motion to File a First Amended Complaint, seeking to add to their Complaint a fraud cause of action based on the Kim's failure to disclose the water service restrictions, as well as a prayer for punitive damages. This motion was denied by a circuit court motions judge, R.A. vol. 2, at 151–52, and the Cresencias have not appealed the denial of said motion.

Consistent with the denial of the Cresencias' Motion to File a First Amended Complaint, the trial judge granted the Kims' motion *in limine* to preclude the introduction of any evidence about the water issue at trial. At the close of the evidentiary portion of the trial, the Cresencias, pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 15(b),[4] orally moved to amend the pleadings to conform to

---

[4] Hawai'i Rules of Civil Procedure (HRCP) Rule 15(b) provides:

**Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at

the evidence adduced at trial. Although the oral motion did not specify with particularity the amendments which the Cresencias sought to add to their complaint, the trial judge orally granted the motion as to all issues except the water service and punitive damages issues, which had already been precluded from being tried. Tr. 7/8/91, at 6–7. However, no written order granting the motion was ever filed.

Following the trial, the trial court entered various Findings of Fact (FsOF) and Conclusions of Law (CsOL). Specifically, the Kims allege that the following FOF No. 18 regarding the fraud issue was erroneous:

> 18.     Relying upon the representations of [Kim Jr.] that several homes could be constructed upon the subject property, [Jean], on behalf of himself and the remaining [Cresencias], executed a standard Deposit, Receipt, Offer and Acceptance ("DROA") on March 6, 1982, wherein [the Cresencias] agreed to purchase the subject property. (Plaintiff's Exhibit 5).

R.A. vol. 5, at 34. The Kims also contend that the following CsOL relevant to the Kims' fraud liability were wrong:

> 24.     There is clear and convincing evidence that the representations of [Kim Jr.] to [the Cresencias] that several homes could be build [sic] on the subject property was [sic] false, that he

---

the trial on the ground that it is not within the issues made by pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence

knew they were false when made, that he contemplated that [the Cresencias] would rely on them, and that [the Cresencias] did rely upon the representations of [Kim Jr.].

25.  There is clear and convincing evidence that [Kim Jr.] misrepresented and/or failed to inform [the Cresencias] of the default status of the Master Agreement of Sale prior to the execution of the Sub–Agreement of Sale to [the Cresencias], that he knew that the Master Agreement of Sale was in default, that he contemplated that [the Cresencias] would rely on him to inform them of said default, and that [the Cresencias] did so rely upon [Kim Jr.] to inform them of said default.

26.  The intentional misrepresentations of [Kim Jr.] are imputable to [the Kims] because the acts and omissions were within the course and scope of his agency and because [the Kims] subsequently ratified said acts and omissions.

27.  [The Kims] are liable to [the Cresencias] for the actual pecuniary loss they sustained due to the intentional misrepresentations of [Kim Jr.]

*Id.* at 43–44.

The Kims argue that the foregoing FOF and CsOL are clearly erroneous and wrong because: (1) they are based on fraudulent circumstances not pleaded with particularity in the Cresencias' Complaint, as required by HRCP Rule 9(b); and (2) they are not supported by the evidence adduced at trial.

## A.  *Failure to Plead Fraud With Particularity*

HRCP Rule 9(b) requires that "[i]n all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity."

According to the Hawai'i Supreme Court:

The rule is designed, in part, to insure the particu-larized information necessary for a defendant to prepare an effective defense to a claim which embraces a wide variety of potential conduct. Thus, under Rule 9(b) general allegations of "fraud" are insufficient because they serve little or no informative function . . . ; rather, a plaintiff must state the circumstances constituting fraud or mistake with particularity (e.g., allege who made the false representations) and specify the representations made.

*Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 30–31, 837 P.2d 1273, 1288, *amended in part on other grounds*, 74 Haw. 650, 843 P.2d 144 (1992) (citations omitted).

The only basis for fraud stated in the Cresencias' Com-plaint was the zoning issue. The Kims therefore argue that it was improper for the trial court to find them liable for fraud based on the water service issue or their failure to disclose their poor payment history under the Master Agreement, since they were not given fair notice of these claims in order to defend against them.

### 1. *The Water Service Issue*

The record on appeal clearly indicates, however, that the trial court did not base its conclusion that the Kims had committed fraud on the water service issue. There is no reference to the water service issue anywhere in the trial court's FsOF and CsOL. Furthermore, since the issue had not been properly pleaded in the Cresencias' Complaint, the court granted and enforced the Kims' Motion in Limine to exclude any and all testimony relating to the water service issue. R.A. vol. 4, at 230–43; Tr. 7/2/91, at 17–18; Tr. 7/5/91, at 7. Finally, at the end of trial, when

the trial court considered the Cresencias' oral motion to amend their complaint to conform to the evidence under HRCP Rule 15(b), the court expressly denied the motion as to the water service issue.

Therefore, we find no merit to the Kims' allegation that the trial court improperly found that they had committed fraud based on the water service issue.

### 2. *The Kims' Failure to Disclose Their Poor Payment History Under The Master Agreement*

The Kims contend that the trial court erroneously included their failure to disclose their poor payment history under the Master Agreement as a ground for finding fraud. We agree.

Pursuant to HRCP Rule 15(b),[5] any party may move to amend its pleadings to conform to the evidence presented at trial, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties[.]" The purpose of Rule 15(b) is to allow an amendment of the pleadings to "bring the pleadings in line with the actual issues upon which the case was tried[,]" 3 J. MOORE AND R. FREER, MOORE'S FEDERAL PRACTICE (3 MOORE'S) ¶ 15.13[2], at 15–130 (2d ed. 1994), and to thus "promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel or on the basis of a statement of the claim or defense that was made at a preliminary point in the action and later proves to be erroneous." 6A C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE: *Civil 2d* (6A

---

[5] See Footnote 4 for text of Rule 15(b).

FEDERAL PRACTICE AND PROCEDURE) § 1491, at 5–6 (1990) (footnote omitted).

According to the Hawai'i Supreme Court, Rule 15(b) is not permissive. *Hamm v. Merrick*, 61 Haw. 470, 474, 605 P.2d 499, 502 (1980). As long as issues are tried by the express or implied consent of the parties to a lawsuit, the issues "*shall* be treated as if raised in pleadings." *Id.* (emphasis in original, quoting 3 MOORE'S ¶ 15.13[2]).

Express consent may be found in a stipulation, or may be incorporated in a pretrial order. 6A FEDERAL PRACTICE AND PROCEDURE § 1493, at 18–19; 3 MOORE'S ¶ 15.13[2], at 15–132.

Consent is generally implied when the party opposing a Rule 15(b) motion fails to object to the introduction of evidence relevant to an unpleaded issue, *Hamm*, 61 Haw. at 473, 605 P.2d at 501, or actually produces evidence bearing on the new issue. 6A FEDERAL PRACTICE AND PROCEDURE § 1493, at 24–28. However, a party's failure to object will not constitute implied consent unless the party had notice that evidence was being introduced to prove the unpleaded issue. *Id.* at 36; *Campbell v. Trustees of Leland Stanford Jr. Univ.*, 817 F.2d 499, 506 (9th Cir. 1987); *Consolidated Data Terminals v. Applied Digital Data Systems, Inc.*, 708 F.2d 385, 396 (9th Cir. 1983). Furthermore, consent will not be implied if a party will be substantially prejudiced by such an amendment. *Id.; International Harvester Credit Corp. v. East Coast Truck*, 547 F.2d 888, 890 (5th Cir. 1977) (quoting *Monod v. Futura, Inc.*, 415 F.2d 1170, 1174 (10th Cir. 1969)). *See also Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–31, 91 S. Ct. 795, 802, 28 L. Ed. 2d 77, 87–88, *reh'g denied*, 401 U.S. 1015, 91 S. Ct. 1247, 28 L. Ed. 2d 552 (1971).

In the instant case, our review of the record reveals no stipulation, pretrial order, or other indication that the Kims expressly consented to have the issue of their failure to disclose their payment history tried by the court below.

Moreover, the record clearly indicates that the Kims did not impliedly consent to having the nondisclosure issue tried against them. The Kims joined in and vigorously argued for a "Motion in Limine to Preclude Introduction of Evidence of All Claims Not Pled." R.A. vol. 3, at 35–36; Tr. 7/2/91, at 18–19. Additionally, they had no notice that they were required to defend against a claim of fraud based upon nondisclosure of their payment history, because the issue was never explicitly raised by the Cresencias during the proceedings below but was mentioned, for the first time, in the trial court's CsOL. Finally, the Kims strenuously objected to the Cresencias' HRCP Rule 15(b) motion to amend, noting that they had gone to trial prepared to defend against only the pleaded issues and were thus not provided an "opportunity to respond" to any new issues which the Cresencias sought to add to the Complaint. Tr. 7/8/91, at 4–6.

Evidence which demonstrated the Kims' knowledge that they were in arrearage under the Master Agreement was introduced at trial without objection. However, such evidence was relevant to the breach of contract claim against the Kims, and it is generally accepted that:

> [W]hen the evidence that is claimed to show that an issue was tried by consent is relevant to an issue already in the case, as well as to the one that is the subject matter of the amendment, and there was no indication at trial that the party who introduced the evidence was seeking to raise a new issue. the pleadings will not be deemed amended

under the first portion of Rule 15(b). The reasoning behind this view is sound since if evidence is introduced to support basic issues that already have been pleaded, the opposing party may not be conscious of its relevance to issues not raised by the pleadings unless that fact is made clear.

6A FEDERAL PRACTICE AND PROCEDURE § 1493, at 32–35 (footnotes omitted). *See also* ***Campbell***, 817 F.2d at 506; ***International Harvester***, 547 F.2d at 890.

We therefore conclude that the trial court erred as a matter of law when it concluded that the Kims' failure to disclose their prior payment history, which had not been adequately pleaded nor tried by consent, supported a finding of fraud.

## B. *Fraud Based on the Zoning Change*

The Kims contend that the only basis for fraud which the trial court could have considered was the downzoning of the subject property, and no *prima facie* case of fraud based on such issue was ever established. We agree.

It is undisputed that Kim Jr.'s representations to Jean as to the zoning of the subject property were true when made. Moreover, no evidence was adduced at trial which revealed any actual knowledge by Kim Jr. or the Kims that the County intended to downzone the subject property. Furthermore, the trial judge specifically stated during closing arguments that the change in zoning was not an issue in the instant case, Tr. 7/8/91, at 17, and there is no mention of the zoning issue in the trial court's FsOF or CsOL.

Accordingly, no fraud liability was established against the Kims based on the zoning change.

## C. *Imputation of Kim Jr.'s Fraudulent Conduct to the Kims*

The Kims contend that it was improper for the trial court to find them liable for fraud based on the intentional misrepresentations of their son, Kim Jr. Since we have already concluded, based on the record and procedural history in this case, that no fraud was established based on the water service issue, the Kims' failure to disclose their prior payment history, or the zoning change, we agree.

## III.

### *The Award of Emotional Distress Damages*

The trial court awarded emotional distress damages of $60,000 to Jean and Juliana and $75,000 to the remaining Cresencias. R.A. vol. 5, at 50–51. The Kims allege that such award was erroneous because: (1) the issue of emotional distress damages was not adequately pleaded by the Cresencias in their Complaint; (2) the issue was not tried by consent of the parties so as to permit its addition as a cause of action to the Cresencias' Complaint; and (3) the Cresencias failed to prove the elements of a claim for emotional distress damages.

We agree that the issue of emotional distress damages was not raised in the Cresencias' Complaint, but conclude that it was tried by consent of the parties. We conclude, however, that the Cresencias did not prove their claim for emotional distress damages.

### A. *The Adequacy of the Crecensias' Complaint*

The Cresencias' Complaint sought damages for breach of contract and fraud. The Cresencias contend that under either theory, they could be awarded emotional distress damages. We disagree.

Traditionally, the remedy for breach of a contract is the recovery of out–of–pocket losses. ***Dold v. Outrigger Hotel***, 54 Haw. 18, 22, 501 P.2d 368, 372 (1972). That is, one who sustains a loss by breach of a contract "is entitled to have just compensation commensurate with his [or her] loss" and only such damages "as will actually or as precisely as possible compensate the injured party." ***Amfac, Inc. v. Waikiki Beachcomber Investment Co.***, 74 Haw. 85, 128, 839 P.2d 10, 32, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (quoting ***Ferreira v. Honolulu Star–Bulletin, Ltd.***, 44 Haw. 567, 573–74, 356 P.2d 651, 655, *reh'g denied*, 44 Haw. 581, 357 P.2d 112 (1960)). Therefore, damages for emotional or mental distress are not recoverable for breach of a contract alone. 3 D. DOBBS, DOBBS LAW OF REMEDIES § 12.5(1), at 107–08 (2d ed. 1993); RESTATEMENT (SECOND) OF CONTRACTS § 353 comment a (1981).

One exception to the foregoing rule is that "where a contract is breached in a wanton or reckless manner as to result in a tortious injury, the aggrieved person is entitled to recover in tort[,]" and thereby recover damages for emotional distress and disappointment in addition to damages for out–of–pocket losses. ***Dold***, 54 Haw. at 22–23, 501 P.2d at 372. In this case, however, the Cresencias' Complaint did not seek damages for the tort of wanton or reckless breach of contract. Therefore, the Kims were never properly put on notice that they had to defend against a tort cause of action.

With respect to claims for fraud or deceit, the only damages generally recoverable are "pecuniary damages"; *i.e.*, damages which will "put the plaintiff in the position he would have been had he not been defrauded" and "which can be accurately calculated in monetary terms

such as loss of wages and cost of medical expenses." *Ellis v. Crockett*, 51 Haw. 45, 52–53, 451 P.2d 814, 820 (1969). Furthermore, "the measure of pecuniary damages is usually confined to either the 'out–of–pocket' loss or the 'benefit of the bargain.' " *Id.* at 53, 451 P.2d at 820 (citations omitted). As a result, "[t]here may be no recovery for mental anguish and humiliation not intentionally inflicted." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 47 (1965)).

Since the Cresencias' Complaint did not state a cause of action for wanton or reckless breach of contract or intentional infliction of emotional distress, mental anguish, or humiliation, we agree with the Kims that the issue of emotional distress damages was not adequately pleaded in this case.

## B. *Trial of the Emotional Distress Issue by Implied Consent*

Although the Cresencias did not state a proper claim for emotional distress damages in their Complaint, the record on appeal does indicate that evidence of such claim was introduced at trial without objection by the Kims. Indeed, the Kims' attorney first opened the door regarding this issue by cross–examining Jean and eliciting testimony about how the family relationships of the Cresencias had deteriorated as a result of the problems stemming from the purchase of the subject property. Tr. 7/3/91, at 34–35. Furthermore, on redirect examination, the Cresencias' attorney, without objection from the Kims' attorney, elicited further testimony from Jean about the emotional distress he and his family had suffered as a result of the problems regarding the subject property. *Id.* at 51–54.

Based on the record, the issue of emotional distress damages was thus tried by implied consent of the parties.

## C. *Adequacy of the Proof of the Emotional Distress Damages Claim*

In support of its award of emotional distress damages, the trial court entered the following FsOF:

31.   [The Cresencias], who until May, 1983, had enjoyed a close and loving relationship with each other, began to experience significant worry, anxiety, distress, grief, and exhibited distrust of [Jean] due to his involvement in the purchase of the subject property.

32.   Over the next several years, the marriage of [Jean] and his wife [Juliana] became unstable, as he was faced with the possibility of divorce due to his involvement in the purchase of the subject property.

33.   The close and loving relationships existing among [the Cresencias] were significantly disrupted over the next several years due to the problems associated with the purchase of the subject property.

34.   [The Cresencias'] interest in the subject property was eventually foreclosed by judicial order in Civil No. 85–0444, in the Circuit Court of the First Circuit, State of Hawai['li, *due to the fact that [the Kims] had not paid their sellers under the Master Agreement of Sale since May 1, 1982,* and by the foreclosure order entered in favor of [the Kims] in this case. (Civil No. 78727).

\* \* \*

37. *The failure of [Spectrum] and [the Kims] to pay their seller under the Master of [sic] Agreement of Sale since May 1, 1982, was wanton or reckless* and, once discovered by [the Cresencias], was a basis for their insecurity with respect to their sellers' ability to perform under the Sub–Agreement of Sale.

R.A. Vol. 5, at 37–38 (emphasis added). The trial court also entered the following CsOL relevant to its emotional distress award:

16. The fact that [Spectrum] and [the Kims] were already in default of their Master Agreement of Sale when they executed the Sub–Agreement of Sale on June 29, 1982, and which they failed to cure, goes to the root of the contract and is so substantial and fundamental so as to defeat the object of the parties in making the Sub–Agreement of Sale. 22 Am.Jur.2d *Damages* section 59.

\* \* \*

18. When a contract is breached in a wanton or reckless manner, resulting in tortious injury, the aggrieved person is entitled to recover in tort in addition to recovering in contract for out–of–pocket losses. *Dold v. Outrigger Hotel*, 54 Haw. 18, 501 P.2d 368 (1972); 58 A.L.R.3d 360.

19. [Spectrum] and [the Kims] breached the Sub–Agreement of Sale in a wanton and reckless manner which resulted in tortious injury to [the Cresencias], therefore [the Cresencias] are entitled to recover in tort in addition to recovering in contract for out–of–pocket losses.

* * *

28. The intentional misrepresentations of [Kim Jr.], which are imputable to [the Kims], were the legal cause of [the Cresencias'] emotional distress.

*Id.* at 41–42, 44.

The trial court's award of emotional distress damages to the Cresencias was thus based on its conclusion that the Kims were liable in tort for wanton and reckless breach of contract, and in fraud for the intentional misrepresentations of their son.

The court's conclusion that the Kims had breached the Sub–Agreement in a wanton and reckless manner, however, was based on its finding that the Kims had failed to make any payments under the Master Agreement of Sale since May 1, 1982 and had failed to cure such default even after they had entered into the Sub–Agreement and received the Cresencias' $30,000 down payment and regular monthly payments of $1,300.

The record on appeal indicates, however, that the Kims did bring their payments under the Master Agreement of Sale current after executing the Sub–Agreement with the Cresencias. Furthermore, after the Sub–Agreement was signed in June 1982, the Kims apparently made all their monthly payments under the Master Agreement until March 1983, since the complaint in the Takeuchi Foreclosure Lawsuit claimed only that the Kims had failed to make their March and April 1983 monthly payments, totaling $2,615. Plaintiffs' Exhibit 53, at 4, ¶ 8. The record indicates that the Kims were perhaps negligent in relying on Spectrum to make their monthly payments to Takeuchi and Malia, since Spectrum was often delinquent in making such payments. However, the

record does not support a finding that the Kims wantonly and recklessly breached the Sub–Agreement so as to be liable to the Cresencias for emotional distress damages.

Furthermore, since we have already concluded that the trial court improperly found and concluded that the Kims were liable to the Cresencias for fraud, an award of emotional distress damages arising out of fraud was also not justified in this case.

## IV.
### *Double Recovery for Fraud and Breach of Contract*

The Kims contend that the Cresencias were improperly awarded a double recovery for both fraud and breach of contract damages. However, the Joint and Several Judgment in this case awarded no damages to the Cresencias specifically for fraud. Furthermore, we have vacated the award of emotional distress damages to the Cresencias. Therefore, the alleged double recovery is without basis in fact.

## V.
### *The Vacatur of the Deficiency Judgment*

Following the Cresencias' earlier appeal from the circuit court's order dismissing their complaint, the Hawai'i Supreme Court set aside the order of dismissal and remanded the case "to the circuit court for further proceedings not inconsistent with this decision." *Cresencia v. Kim*, No. 12801, slip op. at 7. On remand, the Deficiency Judgment which had previously been awarded to the Kims on their counterclaim against the Cresencias was

vacated by the circuit court. R.A. vol. 4, at 348–50. The Kims' counterclaim was subsequently dismissed with prejudice by the trial court. R.A. vol. 5, at 44–45.

The Kims argue that the Deficiency Judgment should not have been vacated on remand because the supreme court's opinion set aside the dismissal of the Cresencias' Complaint only. We disagree.

The supreme court noted that in ordering the dismissal of the Cresencias' Complaint, the circuit court had dismissed the complaint after concluding that the interlocutory decree of foreclosure in the Kims' favor was a final order which was dispositive, on *res judicata* and collateral estoppel grounds, of the merits of the Cresencias' Complaint. Based on its review of the record, however, the supreme court found that "there [w]ere claims [and] counterclaims . . . yet to be determined" in the case, and the interlocutory decree of foreclosure "ha[d] not finally determined the merits of the controversy[.]" ***Cresencia v. Kim***, No. 12801, memo op. at 5. The supreme court then concluded:

> [T]he trial court clearly erred in finding that the interlocutory decree of foreclosure did not reserve any substantive issues of fact or law for further adjudication. We further conclude the court erred as a matter of law in ruling that the interlocutory decree of foreclosure was a final judgment. Res judicata and collateral estoppel did not prevent [the Cresencias] from prosecuting their claims.

*Id.* at 6 (citations omitted).

It is thus apparent that the supreme court considered the previous appeal to be premature and remanded the case so that the merits of the Cresencias' claims and the

Kims' counterclaim could be considered at one trial. It was therefore not error for the circuit court to vacate the Deficiency Judgment, and we need not consider the appropriateness of the trial court's conditional award of additional damages in the event the vacatur of the Deficiency Judgment was reversed on appeal.

## CONCLUSION

In summary, the trial court properly vacated the Deficiency Judgment that had previously been entered against the Cresencias, and correctly concluded that the Kims had breached their Sub–Agreement with the Cresencias. The trial court, erred, however, when it found the Kims liable to the Cresencias in fraud and when it awarded the Cresencias emotional distress damages. Based on the foregoing, we:

(1) affirm that part of the August 23, 1991 Joint and Several Judgment which awarded the Cresencias $156,646.50 against the Kims for breach of contract damages, interest, attorneys' fees, and costs;

(2) reverse that part of the August 23, 1991 Joint and Several Judgment which awarded Jean and Juliana, jointly and severally, $60,000 against the Kims as and for emotional distress damages;

(3) reverse that part of the August 23, 1991 Joint and Several Judgment which awarded Candida B. Cresencia, Perla C. Gamboa, Emma B. Cresencia, Veronica B. Cresencia, and Manuel B. Cresencia, jointly and severally,

$75,000 against the Kims as and for emotional distress damages; and

(4) affirm the July 8, 1991 "Order Granting Plaintiff's [sic] Motion to Vacate Judgments and for Return of All Garnisheed Sums Plus Interest Filed June 10, 1991."

*Philip L. Lahne* (Neeley & Anderson, of counsel); *Diane K. Taira* with him on the briefs (Dinman, Nakamura, Elisha & Lahne, of counsel) for defendants–appellants.

*Gregory T. Grab* on the brief for plaintiffs–appellees.