223 P.3d 246

Kristie TOKUHISA, Court–Appointed Class Representative, individually and on behalf of all others similarly situated, Plaintiff–Appellant,

and

Cynthia Altman and Kelly Muller, individually and on behalf of all others similarly situated, Plaintiffs,

v.

CUTTER MANAGEMENT CO.; Cutter Motor Cars, Inc.; Cutter Dodge, Chrysler, Plymouth, Jeep of Pearl City, Inc. dba Cutter Dodge Chrysler Plymouth Jeep of Pearl City; Red Swan Incorporated, Defendants–Appellees,

and

Doe Defendants 1–50, Defendants,

and

Cutter Management Co.; Cutter Motor Cars, Inc.; Cutter Dodge, Chrysler, Plymouth, Jeep of Pearl City, Inc. dba Cutter Dodge Chrysler Plymouth Jeep of Pearl City, Third–Party Plaintiffs/Counterclaim Defendants–Appellees,

v.

Safe–Guard Products International, Inc., Third–Party Defendant/Counterclaim Plaintiff. Civil No. 02–1–0691

Kristie Tokuhisa, Court–Appointed Class Representative, individually and on behalf of all others similarly situated, Plaintiff–Appellant,

and

Walter Calizo, Rochelle Molina, Ferila Perez, Francisco Ancheta, Kelly Ancheta, Khamtan Tanhchaleun, and Chou Tanhchaleun, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Cutter Management Co.; Cutter Dodge, Inc.; Rainbow Chevrolet, Inc.; Cutter Ford, Inc.; Cutter Imports, Inc.; Cutter Motor Cars, Inc.; Cutter of Waipahu, Inc.; Cutter Pontiac, Buick, GMC of Waipahu, Inc.; Red Swan Incorporated; Safe–Guard Products International, Inc., Defendants–Appellees,

and

Doe Defendants 1–50, Defendants,

and

Cutter Management Co.; Cutter Dodge, Inc.; Rainbow Chevrolet, Inc.; Cutter Ford, Inc.; Cutter Imports, Inc.; Cutter Motor Cars, Inc.; Cutter of Waipahu, Inc.; Cutter Pontiac, Buick, GMC of Waipahu, Inc., Cross–Claim Plaintiffs–Appellees,

v.

Safe–Guard Products International, Inc., Cross–Claim Defendants–Appellees,

and

Doe Defendants 1–50, Cross–Claim Defendants,

and

Safe–Guard Products International, Inc., Cross–Claim Plaintiff-Appellee,

v.

Cutter Management Co.; Cutter Dodge, Inc.; Rainbow Chevrolet, Inc.; Cutter Ford, Inc.; Cutter Imports, Inc.; Cutter Motor Cars, Inc.; Cutter of Waipahu, Inc.; Cutter Pontiac, Buick, GMC of Waipahu, Inc., Cross–Claim Defendants–Appellees. Civil No. 02–1–2915

No. 28641.

Intermediate Court of Appeals of Hawai'i.

Dec. 21, 2009.

Paul Alston (Bruce H. Wakuzawa and Peter S. Knapman (Alston Hunt Floyd & Ing), Honolulu, and George Van Buren and Robert Campbell (Van Buren Campbell & Shimizu) with him on the briefs), Honolulu, for Tokuhisa.

Lisa Woods Munger (Joachim P. Cox and Robert K. Fricke (Goodsill Anderson Quinn & Stifel) with her on the brief), Honolulu, for Cutter.

Lane Hornfeck (Terence J. O'Toole and Wil K. Yamamoto (Starn O'Toole Marcus & Fisher) with him on the brief), Honolulu, for Safe–Guard.

William J. Deeley, Dennis W. King, and Glenn S. Horio (Deeley, King & Pang), on the brief, Honolulu, for Red Swan.

FOLEY and FUJISE, JJ.; and WATANABE, Presiding J., Dissenting and Concurring.

Opinion of the Court by FOLEY, J.

Plaintiff–Appellant Kristie Tokuhisa (Tokuhisa), Court–Appointed Class Representative, individually and on behalf of all others similarly situated, appeals from the Final Judgment filed on June 21, 2007 in the Circuit Court of the First Circuit (circuit court).[1]

This appeal arises from two consolidated class action lawsuits: Civil No. 02–1–0691[2] and Civil No. 02–1–2915.[3] The lawsuits concerned, in part, the sale of Vehicle Theft Registration systems (the VTR)[4] by Defendants–Appellees Cutter Management Co.; Cutter Motor Cars, Inc.; Cutter Dodge, Chrysler, Plymouth, Jeep of Pearl City, Inc. dba Cutter Dodge Chrysler Plymouth Jeep of Pearl City; Cutter Dodge Inc.; Rainbow Chevrolet, Inc.; Cutter Ford, Inc.; Cutter Imports, Inc.; Cutter of Waipahu, Inc.; Cutter Pontiac, Buick, GMC of Waipahu, Inc. (collectively, Cutter); Red Swan, Incorporated (Red Swan); and Safe–Guard Products International, Inc. (Safe–Guard) (collectively, Defendants) to buyers of automobiles (the Class).

The complaints underlying these lawsuits alleged, *inter alia,* that various Cutter dealerships had marketed and sold the VTR by promising or deceptively appearing to promise to pay a specified amount of money to purchasers upon the theft of the automobile. In relevant part, the complaints asserted that such actions on the part of the dealerships constituted "the unlawful marketing and sale of insurance without a proper certificate of

1. The Honorable Sabrina S. McKenna presided.

2. Plaintiffs Cynthia Altman and Kelly Muller (Altman Plaintiffs), individually and on behalf of others similarly situated, filed the First Amended Complaint in Civil No. 02–1–0691.

3. The Complaint in Civil No. 02–1–2915 was filed by Plaintiffs Walter Calizo, Rochelle Molina, Ferila Perez, Francisco Ancheta, Kelly Ancheta, Khamtan Tanhchaleun, and Chou Tanhchaleun (Calizo Plaintiffs), individually and on behalf of all others similarly situated.

4. Both Civil Nos. 02–1–0691 and 02–1–2915 asserted claims based on three separate charges paid by automobile purchasers: (1) a document fee, (2) a license fee, and (3) the VTR fee. The claims related to the document and license fees were settled, and only the VTR fee is at issue in this appeal.

authority and the unlawful marketing of insurance without a proper license," pursuant to Hawaii Revised Statutes (HRS) Chapter 431, and that Defendants' attempts to receive money or their receipt of money from the Class as a result of marketing, selling, and/or transacting the insurance, *"inter alia,"* constituted an Unfair and Deceptive Trade Practice (UDAP), pursuant to HRS Chapter 480.

On September 12, 2003, Cutter filed a motion for partial summary judgment (Motion for Partial SJ), arguing, in sum, that the VTR did not constitute insurance. The circuit court filed an order granting the Motion for Partial SJ (Order Granting Motion for Partial SJ) on December 3, 2003.

The Altman Plaintiffs and Calizo Plaintiffs[5] (collectively, Plaintiffs) filed a Motion for Leave to File an Amended Complaint (Motion to Amend Complaint) on January 6, 2004, to clarify that the UDAP claim included more than the illegal-insurance allegation and also pertained to the "sale and marketing of the VTR" policy. On February 20, 2004, the circuit court denied the motion.

On appeal, Tokuhisa argues that the circuit court

(1) committed reversible error by granting Cutter's Motion for Partial SJ because

(a) there are genuine issues of material fact as to whether Cutter committed a UDAP in marketing and selling insurance without a license under the guise of a warranty for the VTR, an "illusory" theft deterrent/recovery device, and

(b) the determination of whether the VTR constitutes insurance involved, at a minimum, a genuine issue of material fact and did not dispose of Plaintiffs' VTR claims; and

(2) committed reversible error and abused its discretion by

(a) denying the Motion to Amend Complaint because the circuit court read Plaintiffs' complaints narrowly, and

(b) certifying an arbitrarily narrow subclass of VTR consumers who used credit sales contracts and "alleged" that the VTR is insurance.

Tokuhisa requests that we remand this case to the circuit court with instructions to

(1) vacate the judgment as to the VTR claims; (2) reverse the [Order Granting Motion for Partial SJ]; (3) allow litigation on the VTR claims in accordance with the issues actually litigated in connection with [Cutter's Motion for Partial SJ], either through allowing amendment of Plaintiffs' [c]omplaints or by finding that the parties have consented to try those issues pursuant to [Hawai'i Rules of Civil Procedure (HRCP)] Rule 15(b); and (4) vacate the Class Certification Order and instruct the Circuit Court to certify a class for further litigation based on the VTR subclass definition in the settlement agreement.

## I.

On March 17, 2002, the Altman Plaintiffs filed an amended class action complaint against some Cutter entities and Red Swan[6] (Altman's Complaint). Altman's Complaint provided in relevant part:

20. Cutter marketed and sold a "VTR" package to Plaintiffs and the Class in which [Cutter and/or Red Swan] promised or deceptively appeared to promise to pay a specified amount to purchasers upon a contingency, e.g. the theft of the automobile.

21. The marketing and sale of the "VTR" package constitutes the unlawful marketing and sale of insurance without a proper certificate of authority and the unlawful marketing of insurance without a proper license. *See* [HRS] § 431:1–201 (defining "insurance" in relevant part as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies"); [HRS] § 431:8–201 (prohibiting any "insurer"

---

5. *See supra* notes 2 and 3 and accompanying text.

6. Cutter's Motion for Partial SJ states that the VTR consisted of an identification code that was etched into the windows of a vehicle and

registration of that code "into the database maintained by the program administrator (i.e., defendant Red Swan, Inc. dba Vehicle Theft Administrators)."

from conducting insurance business in Hawai'i without a certificate of authority issued by the state); [HRS] § 431:9–201 (prohibiting any agent from marketing insurance in Hawai'i without a license[)].

22. [Cutter and Red Swan] deceptively and surreptitiously marketed the insurance as a "warranty" not as "insurance."

23. The policy sold by [Cutter and Red Swan] did not state who, if anyone, would have to make payment and that full payment would only be made if:

 a. comprehensive insurance was in force;

 b. the theft resulted in a total loss;

 c. the comprehensive insurer paid at least $2,500.00; and

 d. the insured purchased a comparable vehicle within 120 days.

24. Cutter's and/or [Red Swan's] above described unlawful attempts to obtain money from and receipt of money from the Class as a result of marketing and selling insurance, *inter alia*, constitutes [a UDAP].

On July 18, 2002, Red Swan filed an answer to Altman's Complaint, and on July 26, 2002, Cutter filed its answer to the complaint.

On December 13, 2002, the Calizo Plaintiffs filed a Complaint against some of the Cutter entities, Red Swan, and Safe–Guard[7] (Calizo's Complaint). Calizo's Complaint provided in relevant part:

39. Under the terms of the VTR policy, [Cutter], Red Swan, and/or Safe–Guard promised to pay a specified amount to purchasers upon a contingency, e.g. the theft of the automobile under certain terms and conditions.

40. [Calizo] Plaintiffs purchased the VTR policy, and [Cutter], Red Swan, and/or [Safe–Guard] received money from [Calizo] Plaintiffs from the sale of the VTR policy.

41. The marketing and sale of the VTR policy constitute the unlawful marketing and sale of insurance without a proper certificate of authority and the unlawful marketing of insurance without a proper license. *See* [HRS] § 431:1–201 (defining "insurance" in relevant part as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies"); [HRS] § 431:1–209 (defining "general casualty insurance" in relevant part as "Against any contract of warranty or guaranty which promises … money … in the event of loss of or damage to a motor vehicle."); [HRS] § 431:8–201 (prohibiting any "insurer" from conducting insurance business in Hawai'i without a certificate of authority issued by the state); [HRS] § 431:9–201 (prohibiting any agent from marketing insurance in Hawai'i without a license).

42. [Cutter], Red Swan, and/or [Safe–Guard] marketed and sold the VTR policies without disclosing that they were not licensed to market, sell, or transact insurance in the State of Hawai'i.

43. [Cutter], Red Swan, and/or [Safe–Guard] knew, or should have known, that if the consumers to whom the VTR policies were being marketed and sold already had insurance, the VTR policy would constitute illegal over-insurance.

44. [Cutter], Red Swan, and/or [Safe–Guard] deceptively and surreptitiously marketed the insurance as a "warranty" not as "insurance."

45. The VTR policy sold by [Cutter], Red Swan, and/or [Safe–Guard] did not state who, if anyone, would have to make payment and that full payment would only be made if, *inter alia:*

 a. Comprehensive insurance was in force;

 b. The theft resulted in a total loss;

 c. The comprehensive insurer paid at least $2,500.00; and

 d. The insured purchased a comparable vehicle within 120 days.

46. The foregoing acts of [Cutter] and/or Red Swan and/or [Safe–Guard] as well as the unlawful attempts to obtain, and/or receive, money from [Calizo Plaintiffs] as a result of marketing, selling, and transacting insurance, without meeting the

---

7. VTR is a Safe–Guard product.

requirements of the Hawaii Insurance Code, constitute unfair and deceptive trade practices [UDAPs].

(Ellipses in original.)

The Altman and Calizo cases were consolidated by stipulation of the parties on August 1, 2003.

In its September 12, 2003 Motion for Partial SJ,[8] Cutter argued that (1) the sale of the VTR did not constitute the sale of insurance, as a matter of law; (2) the value of the VTR was well-established; (3) the determination that theft-deterrent products, accompanied by written warranties for product failure, constitute insurance would improperly and unnecessarily expand the definition of insurance and undermine the law of warranties; and (4) the text and legislative history of Act 237 (Act 237), 2002 Haw. Sess. Laws at 936–43, showed that window etching[9] had never been deemed to constitute insurance.

On September 22, 2003, Plaintiffs filed a memorandum in opposition to the Motion for Partial SJ. Safe–Guard filed a reply on September 25, 2003.

On September 30, 2003, the circuit court held a hearing on the Motion for Partial SJ and filed the Order Granting Motion for Partial SJ on December 3, 2003.

On January 6, 2004, Plaintiffs filed their Motion to Amend Complaint, to which Plaintiffs attached a sample of their proposed second amended complaint. Altman Plaintiffs and Calizo Plaintiffs' respective complaints had claimed UDAPs with regard to Cutter's "sale and marketing of insurance without a license or certificate of authority" only. In their proposed second amended complaint, Plaintiffs requested, among other things, to clarify that their UDAP claims related to the "sale and marketing of *the VTR policy and including without limitation the sale and marketing of* insurance without a license or certificate of authority *and the sale and marketing of invalid, improper, unfair, and deceptive warranties.*"

(Emphases in original to indicate requested amendments.)

On January 8, 2004, Cutter filed a memorandum in opposition, in which Red Swan joined, to the Motion to Amend Complaint. Plaintiffs filed a reply memorandum on January 13, 2004. On January 15, 2004, Safe–Guard filed its opposition memorandum.

At the February 2, 2004 hearing on the Motion to Amend Complaint, the circuit court stated that it was going to deny the motion because Plaintiffs proposed to amend claims on which the court had already granted summary judgment and Plaintiffs provided no explanation for the delay in amending the complaints to include new VTR claims. On February 20, 2004, the circuit court filed an order denying Plaintiff's Motion to Amend Complaint.

Sometime around October 2004, Tokuhisa filed a complaint against Cutter Defendants, alleging claims similar to Plaintiffs'.

Plaintiffs received a settlement offer from Cutter and, on July 28, 2005, filed a Motion to (1) Substitute Class Representative, (2) Proceed with Approval of Settlement of Certain Individual Claims and (3) Certify a Class and Sub–Class. The circuit court filed an order in which it (1) denied the settlement of certain individual claims; (2) granted the motion to certify a class and sub-class; and (3) granted the motion to substitute Tokuhisa as class representative and ordered that Tokuhisa "may serve as a class representative for a sub-class consisting of all consumers within the class defined herein who: (i) purchased VTR from the dealerships included within Cutter Group during a period beginning on March 16, 1998 and ending on December 31, 2002; and (ii) allege that sale of VTR constituted unauthorized sale of insurance[.]"

## II.

### A. Grant/Denial of Motion for Summary Judgment

The standard of review for the grant or denial of a motion for summary judgment

---

8. Safe–Guard joined in the Motion for Partial SJ.

9. The Motion for Partial SJ stated that the VTR was "a third-party vehicle protection product in the form of a window glass etch theft deterrent and vehicle recovery product[.]"

is well-settled. "Unlike other appellate matters, in reviewing summary judgment decisions an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied." *Beamer v. Nishiki*, 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983). "This court reviews a circuit court's grant or denial of summary judgment *de novo*." *Bremer v. Weeks*, 104 Hawai'i 43, 51, 85 P.3d 150, 158 (2004) (quoting *Hawai'i Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000)).

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together, with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.* A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom, in the light most favorable to the party opposing the motion.

*Omerod v. Heirs of Kaheananui*, 116 Hawai'i 239, 254–55, 172 P.3d 983, 998–99 (2007) (citations omitted) (emphasis added).

*Blaisdell v. Dep't of Pub. Safety*, 119 Hawai'i 275, 282, 196 P.3d 277, 284 (2008).

**B. Interpretation of a Statute**

 The interpretation of a statute is a question of law reviewable de novo.

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

*Ka Pa'akai O Ka'Aina v. Land Use Comm'n*, 94 Hawai'i 31, 41, 7 P.3d 1068, 1078 (2000)

(internal quotation marks and citations omitted) (quoting *Amantiad v. Odum*, 90 Hawai'i 152, 160, 977 P.2d 160, 168 (1999)).

**C. Denial of Motion for Leave to Amend a Complaint**

 "Orders denying motions for leave to amend a complaint are reviewed for an abuse of discretion." *Jou v. Dai–Tokyo Royal State Ins. Co.*, 116 Hawai'i 159, 163, 172 P.3d 471, 475 (2007) (internal quotation marks and citation omitted).

**III.**

**A. Motion for Partial SJ**

Tokuhisa contends the circuit court committed reversible error by granting Cutter's Motion for Partial SJ. Tokuhisa maintains that whether a challenged practice constitutes a UDAP is a factual issue and, specifically, that whether Cutter's marketing and sale of the VTR constituted the marketing and sale of insurance—in other words, whether the VTR is insurance—is a genuine issue of material fact.

It is undisputed that each VTR system purchased in this case was accompanied by a contract containing one of the following statements:

THREE (3) YEAR LIMITED ANTI–THEFT WARRANTY

THIS WARRANTY IS BETWEEN VEHICLE THEFT ADMINISTRATORS [VTA] AND YOU, THE ORIGINAL OWNER OF THE REGISTERED VEHICLE LISTED HEREIN.

[VTA] warrants to the original owner of the described vehicle herein, when properly equipped with the [VTR], that the [VTR] will be an effective deterrent against vehicle theft. In the event the [VTR] system fails to deter theft and the described vehicle herein is stolen and not recovered within thirty (30) days, VTA will pay the registered owner $2,500.00 towards the replacement of another comparable vehicle. This warranty is not an insurance policy. This warranty is between you and us. It will become effective

only after it is reported by your selling dealership and received by VTA.

or

☐ **VTR THREE (3) YEAR LIMITED ANTI–THEFT WARRANTY—$1500.00**

ENHANCED SECURITY OPTION

☐ **S.I. FIVE (5) YEAR LIMITED ANTI–THEFT WARRANTY $2500**

THIS WARRANTY IS BETWEEN [VTA] AND YOU, THE ORIGINAL OWNER OF THE REGISTERED VEHICLE LISTED HEREIN.

[VTA] warrants to the original owner of the described vehicle herein, when properly equipped with the [VTR] and Starter Interrupt System (S.I.), that the anti-theft device(s) will be an effective deterrent against theft. In the event the VTR or S.I. system fails to deter theft and the described vehicle herein is stolen and not recovered within thirty (30) days, VTA will pay the registered owner either $1500 (VTR only), or $2500 (VTR and S.I.) in accordance with the protection selected above in box 1 or 2, towards the replacement of another comparable vehicle. This warranty is not an insurance policy. This Warranty is between you and VTA. It will become effective only after it is reported by your selling dealership and received by VTA.

In the Motion for Partial SJ, Cutter maintained that "the principal purpose of the VTR ... is to deter theft and aid in the recovery of stolen vehicles" and the fact that it was accompanied by a warranty did not make its sale equivalent to the sale of an insurance policy. Cutter stated that the VTR deterred theft in the following way:

Window etching deters theft because, among other things, the permanent code etched in the vehicle's windows cannot be removed without breaking or noticeably marring the glass. Driving a stolen car with traceable, etched glass presents the risk of being caught and arrested if stopped by the police, who can easily trace the vehicle's owner by calling the registration administrator. Stealing a vehicle with identification codes etched on the glass is unprofitable because glass replacement is expensive. Professional thieves recognize that vehicles with etched windows are traceable, glass is expensive to replace, and the automobile and etched glass are difficult to sell, even to illegal "chop shops." Window etching is so effective that it is warranted against failure and a liquidated damages provision backs up that warranty of effectiveness.

(Record references omitted.)

Cutter maintained that the VTR did not meet the definition of insurance found in HRS § 431:1–201, even though indemnification was a part of the VTR's warranty, and Cutter argued the following with regard to the warranty:

The promises made about the window etch products purchased by Plaintiffs are in the form of warranties; the "distinctive character" and primary purpose of the window etching is clearly stated as the provision of an "effective deterrent against vehicle theft"; the warranty is expressly limited to scenarios in which the window etching product "fails to deter theft"; and the warranty unequivocally states that it "is not an insurance policy." As with any warranty, some element of risk assumption and indemnification obligation exists. But that is facially not the "primary purpose" of the warranty. The primary purpose, plainly stated in the VTR document itself, is to etch the vehicle's windows and thereby provide "an effective deterrent against vehicle theft." The risk assumption and indemnification obligation exists—as in all warranties—as an assurance that the product will perform as promised and that the vendor will suffer the financial consequences if its product does not work as promised. But, again, the "primary purpose" of window etching is to avoid theft of the vehicle in the first instance. To hold that such a warranty is "insurance" would be to ignore the principal purpose test and would destroy the entire concept of product warranties.

(Record references omitted.)

Cutter went on to argue, *inter alia*, that the text and legislative history of Act 237

showed that window etching has never been deemed to constitute insurance. Act 237 was codified as HRS Chapter 481R, "Vehicle Protection Product Warrantors." Hawaii State Legislature; Bill Status and Documents; 2002 Regular Session Bill and Resolution Status, Text, and Committee Reports; "A Bill for an Act Relating to Vehicle Protection Products"; http://www.capitol.hawaii.gov/session2002/bills/SB3028_cd1_.htm.

In their memorandum in opposition to the Motion for Partial SJ, Plaintiffs attached a declaration by Honolulu Police Department (HPD) Lieutenant Nobriga (Nobriga), in which he stated that he was in charge of the HPD Vehicle Theft Detail Criminal Investigation Division and was personally aware of the methods the officers in that division used to trace the ownership of stolen cars recovered on Oʻahu. Nobriga declared that "[i]n my experience, the non-[vehicle identification number (VIN)] etches by Safe–Guard and other commercial companies have never been used by the [HPD] in retrieving stolen vehicles, and I do not believe that they have any value in deterring auto theft in Honolulu." Nobriga first learned of the Safe–Guard VTR approximately three months prior to making the declaration. He further stated that in the prior two to three months, officers under his direction had recovered about five to ten stolen vehicles that had window etches [VTRs], and in each case, when the officers called the 1–800 number associated with the etch [VTR], no one answered, the person who answered the call knew nothing about the situation or could not provide any information about the vehicle, or no one returned the message left by the officers.

Plaintiffs also attached to their opposition memorandum the written testimony of State Insurance Commissioner Wayne Metcalf (Metcalf), given at a presentation of the Department of Commerce and Consumer Affairs (DCCA) Insurance Division (Division) to the Senate Committees on Transportation, Military Affairs, and Government Operations, and Commerce, Consumer Protection and Housing at the 2002 regular session of the Hawaiʻi Legislature, in opposition to S.B. 3028, which led to the enactment of Act 237. Metcalf testified that Act 237 proposed that the Division "regulate motor vehicle protection product warrantors by establishing a regulatory regime patterned after [HRS] [C]hapter 481X—the Service Contracts Act of 2000." Metcalf further testified that "the Division's investigation has found that the [VTR] is not used by any law enforcement agency on Oahu and is redundant to existing, more reliable, vehicle identification systems.... The product's reputation among law enforcement as a method of theft deterrence is at best ... dubious." Metcalf stated that "the 'product' in this case is merely incidental to the promise of indemnification should the car be stolen. Therefore, the Division considers the VTR to be effectively a contract for insurance. The product itself is illusory[.]"

Plaintiffs also attached a transcript of a deposition of Mark Kenneth Swannie (Swannie), a Safe–Guard agent, to their memorandum. Tokuhisa argues in her opening brief that in his testimony, Swannie "could not specify a single instance in which a vehicle was recovered because of a VTR."

In their opposition memorandum, Plaintiffs argued that Cutter misconstrued the legislative history of Act 237 and the history actually showed, among other things, that the Division considered "VTR to be effectively a contract for insurance."

Plaintiffs based their UDAP claims primarily on HRS Chapter 431, "Insurance Code." HRS § 431:1–201 (2005 Repl.) defines "insurance" as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." HRS § 431:1–202 (2005 Repl.) defines "insurer" as "every person engaged in the business of making contracts of insurance and includes reciprocal or interinsurance exchanges." HRS § 431:1–208 (2005 Repl.) defines "vehicle insurance" as "insurance against loss of or damage to any land vehicle[.]" HRS § 431:8–201 (1993) provides that "[i]t shall be unlawful for any insurer to transact an insurance business in this State, as defined in section 431:1–215, without a certificate of authority[.]" HRS § 431:1–215 (2005 Repl.) provides:

§ 431:1–215 **Transaction of an insurance business.** Transaction of an insur-

ance business means any of the following acts in this State effected by mail or otherwise by or on behalf of an insurer.

 (1) The making of or proposing to make, as an insurer, an insurance contract;

 (2) The making of or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety;

 (3) The taking or receiving of any application for insurance;

 (4) The receiving or collection of any premium, commission, membership fees, assessments, dues or other consideration for any insurance or any part thereof;

 (5) The issuance or delivery of contracts of insurance to residents of this State or to persons authorized to do business in this State;

 (6) The transaction of any kind of insurance business specifically recognized as transacting an insurance business under this code; or

 (7) The transacting or proposing to transact any insurance business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of this code.

Whether a window etch device like the VTR constitutes insurance has not been addressed in Hawai'i; however, two cases from other jurisdictions resolve the issue. In *Pope v. TT of Lake Norman, LLC*, 505 F.Supp.2d 309, 310–12 (W.D.N.C.2007), the United States District Court concluded that the Secure Etch Silent Guard Security System (which was virtually identical to the VTR) constituted a warranty rather than insurance because it was a theft deterrent system. The District Court noted the well-settled principle that " 'a warranty covers defects in the article sold while insurance indemnifies against damage from perils outside the article.' " *Id.* at 312 (quoting *GAF Corp. v. County Sch. Bd.*, 629 F.2d 981, 983 (4th Cir.1980)).

However, in *Phelps v. Robert Woodall Chevrolet, Inc.*, 306 F.Supp.2d 593 (W.D.Va.

2003), the United States District Court reached the opposite conclusion with respect to another similar product, the Automotive Theft Protection (ATP). *Id.* at 594 & 597. Phelps argued that the ATP constituted insurance because it involved the shifting of a risk, which was "the essence of insurance." *Id.* at 596. Phelps maintained that by purchasing the ATP, he shifted the risk of theft to A Touch of Class (ATOC), the ATP administrator. *Id.* at 594 & 596–97. The District Court accepted Phelps's argument. *Id.* at 597. The District Court found that the ATP warranted against nothing "other than an ultimate outcome perpetrated by a third party," i.e., thieves stealing the vehicle. *Id.*

 In the instant case, although the accompanying contracts clearly state in their headings that the VTR comes with a warranty and the word "warranty" is repeated at least twice, a court should not consider the terminology used in the contract, but only the nature of the contract actually entered into in determining whether it is a contract for insurance. Lee R. Russ and Thomas F. Segalla, 1 *Couch on Insurance 3d* § 1:8 (2005). Even disregarding that evidence, however, we conclude that the VTR does not constitute insurance. It is significant, albeit not controlling, *id.*, that the accompanying contracts state: "This warranty is not an insurance policy." Further, the documents provide that in the event the VTR system "*fails* to deter theft and the described vehicle herein is stolen and not recovered within thirty (30) days, VTA will pay the registered owner" an amount of money. (Emphasis added.) A contract will be deemed a warranty when it guarantees against a defect in the product itself, whereas insurance indemnifies against outside perils. *Couch on Insurance 3d* at § 1:6; *Pope*, 505 F.Supp.2d at 312. Here, the VTR warranted against the "defect" that the system would fail to deter a theft and fail to aid in the recovery of the owner's vehicle. It did not warrant against the fortuitous happening of the theft itself.

The legislative history of Act 237 supports this view and makes clear that it was enacted not to except the VTR from insurance regulation, but to clarify that the warranties associated with vehicle theft protection products are not insurance, in response to pending

lawsuits. During the 2002 Hawai'i legislative session, in H. Stand. Comm. Rep. No. 897–02 dated March 22, 2002 on S.B. No. 3028, the Committees on Transportation and Consumer Protection and Commerce reported to the Speaker of the House of Representatives:

> Many antitheft products and theft deterrent devices are currently being sold on the market.... Oftentimes, warranties accompany these devices which provide[ ] that the company will back up its warranty by paying a specified, agreed upon, maximum amount for damages incurred by the customer as a result of the failure of the product. However, concerns have been raised that individuals are considering this warranty to be a form of insurance on the vehicle. Moreover, according to NVPA [the National Vehicle Protection Association], a lawsuit is currently pending regarding this issue and the legislatures of Texas and New York have attempted to deal with this problem by clarifying that these warranties are not insurance policies.

Whether Cutter engaged in a UDAP through the marketing and sale of insurance is determined largely by the language of the "warranty" contracts accompanying the VTR systems Cutter sold (accompanying contracts). "If the language of a contract is unambiguous, ... the interpretation of the contract presents a question of law to be decided by the court." *Wittig v. Allianz, A.G.*, 112 Hawai'i 195, 201, 145 P.3d 738, 744 (App.2006). Here, each VTR system came with an accompanying contract, which unambiguously states that if the VTR fails to deter theft and the stolen vehicle is not recovered within thirty days, VTA will pay the vehicle's registered owner an amount of money toward the purchase of a replacement vehicle. Given the foregoing, whether Cutter engaged in a UDAP through the marketing and sale of insurance is a question of law.

The circuit court did not err in ruling that the VTR was not insurance and by granting Cutter's Motion for Partial SJ.

## B. Motion to Amend Complaint

Tokuhisa contends the circuit court reversibly erred by denying the Motion to Amend Complaint.

HRCP Rule 15(b) provides:

## Rule 15. AMENDED AND SUPPLEMENTAL PLEADINGS.

> . . . .
>
> **(b) Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

Tokuhisa argues that the circuit court violated HRCP Rule 15(b) and abused its discretion by reading the complaints narrowly. Tokuhisa contends the complaints

> on their face show that [the UDAP] claims relating to VTR were not based solely on the fact that [Cutter was] selling illegal insurance; that was just an example of a UDAP. Paragraph 24 [of the First Amended Complaint] makes this clear by use of the phrase "inter alia." ... In light of the Hawaii Supreme Court's repeated instruction that pleadings should be construed liberally and not technically, the Circuit Court erred in granting summary judgment on all VTR-related claims based solely on its conclusion that the VTR is not insurance.

(Citation, footnote, and record reference omitted.)

Paragraph 24 of the Altman Plaintiffs' First Amended Complaint provides: "Cut-

ter's and/or [Red Swan's] above described unlawful attempts to obtain money from and receipt of money from the Class as a result of marketing and selling insurance, *inter alia*, constitutes [a UDAP]."

HRCP Rule 8 provides in relevant part:

**Rule 8. GENERAL RULES OF PLEADING.**

**(a) Claims for relief.** A pleading which sets forth a claim for relief ... shall contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded.

. . . .

**(e) Pleading to be concise and direct; consistency.**

(1) Each averment of a pleading shall be simple, concise, and direct.

(2) A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count ... or in separate counts. . . . A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal or on equitable grounds or on both.

 Under Hawai'i's "notice pleading" approach, it is "no longer necessary to plead legal theories with ... precision." *Leslie v. Estate of Tavares*, 93 Hawai'i 1, 4, 994 P.2d 1047, 1050 (2000). "Hawaii's rules of notice pleading require that a complaint set forth a short and plain statement of the claim that provides defendant with fair notice of what the plaintiff's claim is and the grounds upon which the claim rests. Pleadings must be construed liberally." *Genesys Data Technologies, Inc. v. Genesys Pac. Technologies, Inc.*, 95 Hawai'i 33, 41, 18 P.3d 895, 903 (2001) (citations omitted); *see also Hall v. Kim*, 53 Haw. 215, 221, 491 P.2d 541, 545 (1971) (holding it is "not necessary to plead under what particular law the recovery is sought"). Moreover, consistent with the mandate of HRCP Rule 8(f) that "[a]ll pleadings shall be so construed as to do substantial justice," the Hawai'i Supreme Court has rejected "the approach that pleading is a

game of skill in which one misstep by counsel may be decisive to the outcome and in turn accepted the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Hall*, 53 Haw. at 221, 491 P.2d at 545 (internal quotation marks and citation omitted).

In *Baldonado v. Way of Salvation Church*, 118 Hawai'i 165, 185 P.3d 913 (App.2008), *cert. rejected*, No. 27169, 2008 WL 3845297 (Aug. 19, 2008), this court stated the following with regard to HRCP Rule 15(a):

This court has interpreted the rule as meaning that "the grant or denial of leave to amend under Rule 15(a) is within the discretion of the trial court." *Associated Eng'rs & Contractors v. State*, 58 Haw. 187, 218, 567 P.2d 397, 417 (1977) (citing *Bishop Trust Co., Ltd. v. Kamokila Dev. Corp.*, 57 Haw. 330, 555 P.2d 1193 (1976)).

In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Associated Eng'rs & Contractors*, 58 Haw. at 218–19, 567 P.2d at 417 (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227[, 230, 9 L.Ed.2d 222] (1962)). *Tri–S Corp. v. Western World Ins. Co.*, 110 Hawai'i 473, 490, 135 P.3d 82, 99 (2006).

118 Hawai'i at 168, 185 P.3d at 916 (ellipsis omitted).

 Even construing Altman Plaintiffs' and Calizo Plaintiffs' respective complaints liberally, we cannot say that the complaints included a UDAP claim besides the one alleging that Cutter marketed and sold insurance in the form of the VTR. Any other UDAP claim the Altman Plaintiffs and Calizo Plaintiffs may have intended to make did not follow "Hawaii's rules of notice pleading" because the complaints did not "set forth a short and plain statement" of such a claim,

providing Cutter with fair notice of what the claim was and the grounds upon which the claim rested. *Genesys,* 95 Hawai'i at 41, 18 P.3d at 903. For that reason, the circuit court would have created an injustice to Cutter if it had granted the Motion to Amend Complaint.

Further, Plaintiffs did not file the Motion to Amend Complaint until after the circuit court had already granted partial summary judgment in favor of Cutter. Tokuhisa offers no persuasive explanation for the delay. At the hearing on the Motion to Amend Complaint, the circuit court orally ruled that it was denying the motion because the proposed amendments concerned "claims on which the Court has already granted summary judgment. And, second, because it gives no reasons as to why these delayed amendments on new VTR claims."

> [I]n interpreting the [federal rule analogous to HRCP Rule 15(a) ], the federal courts have observed that "[a] motion for leave to amend is not a vehicle to circumvent summary judgment." *Schlacter–Jones v. General Tel.,* 936 F.2d 435, 443 (9th Cir.1991); *see also Coplin v. Conejo Valley Unified School Dist.,* 903 F.Supp. 1377, 1388 (C.D.Cal.1995) ("It is generally inappropriate to grant leave to amend a complaint while summary judgment is pending." (citing *Schlacter, supra* )); *Felde v. City of San Jose,* 839 F.Supp. 708, 711 (N.D.Cal.1994) ("[T]he city has a pending dispositive motion before this court. To add a cause of action at this point would delay without sufficient justification the final resolution of this case." (citing *Schlacter, supra* )).

*Fed. Home Loan Mortgage Corp. v. Transamerica Ins. Co.,* 89 Hawai'i 157, 162, 969 P.2d 1275, 1280 (1998) (footnote omitted).

Tokuhisa maintains, in the alternative, that the parties actually litigated the issues Plaintiffs moved to add in their proposed second amended complaint and, pursuant to HRCP Rule 15(b), the circuit court should have granted the Motion to Amend Complaint on that basis.

In *Schefke v. Reliable Collection Agency, Ltd.,* 96 Hawai'i 408, 32 P.3d 52 (2001), the Hawai'i Supreme Court stated the following with regard to HRCP Rule 15(b):

> "The purpose of Rule 15(b) is to allow an amendment of the pleadings to 'bring the pleadings in line with the actual issues upon which the case was tried[,]' " *Cresencia [v. Kim],* 10 Haw.App. [461, 477, 878 P.2d 725, 734 (1994) ] (quoting 3 J. Moore and R. Freer, *Moore's Federal Practice* ¶ 15.13[2], at 15–130 (2d ed.1994)), and to " 'promote the objective of deciding cases on their merits rather than in terms of the relative pleading skills of counsel or on the basis of a statement of the claim or defense that was made at a preliminary point in the action and later proves to be erroneous.' " *[Cresencia,* 10 Haw.App.] at 477–78, 878 P.2d at 734 (quoting 6A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure: Civil 2d* § 1491, at 5–6 (1990) (footnote omitted)). " 'Rule 15(b) is not permissive in terms: it provides that issues tried by express or implied consent shall be treated as if raised in pleadings.' " *Hamm v. Merrick,* 61 Haw. 470, 474, 605 P.2d 499, 502 (1980) (quoting 3 *Moore's Federal Practice,* at 177).

*Id.* at 433, 32 P.3d at 77 (some brackets in original and some added).

> On appeal, Tokuhisa contends that
>
> it was [Cutter] that opened the door to trying the efficacy/sham nature of the VTR. [Cutter] devoted five pages of their memorandum [in support of their Motion for Partial SJ] and the bulk of their exhibits and declarations [therein] to extolling the virtues of VTR. [Cutter] even admitted in their memorandum [in support of the Motion for Partial SJ] that they construed Plaintiffs' VTR claims broadly:
>
>> Plaintiffs are simply wrong when they allege that the provision of window etching by the automobile sales industry is "unfair and deceptive." Quite to the contrary, window etching is widely recognized as highly valuable and desirable.
>
> In response, ... Plaintiffs introduced a great deal of controverting evidence that VTR is worthless.
>
> (Record references omitted.)
>
> In their Motion for Partial SJ, Cutter argued that the value of the VTR was well-

established. Cutter cited to recognition given to the VTR's value by the federal government, state legislatures, law enforcement agencies, trade groups, and the insurance industry. In Plaintiffs' opposition memorandum to the Motion for Partial SJ, they argued that their UDAP claim was not solely based on violations of the insurance code and the VTR had no value. However, in both the Motion for Partial SJ and the opposition memorandum, the parties largely argued the UDAP claim based on Cutter's alleged violation of HRS Chapter 431.

Further, in their pleadings below, neither party applied HRS Chapter 480 to the facts to support a UDAP claim based on Cutter's marketing and sale of the VTR itself. Asserting or defending a claim based on Chapter 480 would have required much more analysis than simply a discussion of the value, or lack thereof, of the VTR.

For example, HRS § 480–2(b) (1993) ("Unfair competition, practices, declared unlawful") provides that "[i]n construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), as from time to time amended."

HRS § 480–2 (1985) "outlaws unfair methods of competition and unfair or deceptive trade practices [UDAPs] in sweeping terms." *Island Tobacco Co. v. R.J. Reynolds Tobacco Co.*, 63 Haw. 289, 300, 627 P.2d 260, 268 (1981). The statute "was constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair or deceptive practices for the protection of both consumers and honest businessmen." *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 616, 607 P.2d 1304, 1311 (1980) (footnote omitted). *Kukui Nuts of Hawaii v. R. Baird & Co.*, 7 Haw.App. 598, 610, 789 P.2d 501, 510 (1990).

▮ HRS § 480–2(a) (1993) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce is unlawful."

"A practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rosa v. Johnston*, 3 Haw.App. 420, 427, 651 P.2d 1228, 1234 (1982) (quoting *Spiegel, Inc. v. F.T.C.*, 540 F.2d 287, 293 (7th Cir.1976)) (brackets omitted) (citation omitted). The statute "outlaws unfair methods of competition and [UDAPs] in sweeping terms." [*Island Tobacco Co.*, 63 Haw. at 300, 627 P.2d at 268].

*Han v. Yang*, 84 Hawai'i 162, 177, 931 P.2d 604, 619 (App.1997).

The phrase "unfair or deceptive acts or practices in the conduct of any trade or commerce" is not defined in HRS [C]hapter 480.

In [*Rosa* ], we adopted the definition set forth in [*Spiegel* ] that "a practice is unfair when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Rosa*, 3 Haw.App. at 427, 651 P.2d at 1234. The federal cases have defined deception as an act causing, as a natural and probable result, a person to do that which he or she would not otherwise do. *Bockenstette v. FTC*, 134 F.2d 369[, 371] (10th Cir.1943). However, the cases indicate that actual deception need not be shown; the capacity to deceive is sufficient. *Goodman v. FTC*, 244 F.2d 584[, 604] (9th Cir.1957).

[*Eastern Star, Inc.[, S.A.] v. Union Bldg. Materials Corp.,*] 6 Haw.App. [125,] 132–33, 712 P.2d [1148,] 1154 [ (1985) ] (footnote omitted). As is evident from the federal definitions properly adopted by the ICA in *Rosa* and *Eastern Star*, "deceptive" acts or practices are distinct from "unfair" acts or practices, both in how they are defined and in the standard by which they are proved.

*State ex rel. Bronster v. U.S. Steel Corp.*, 82 Hawai'i 32, 51, 919 P.2d 294, 313 (1996) (brackets in original omitted).

In *Courbat v. Dahana Ranch, Inc.*, 111 Hawai'i 254, 141 P.3d 427 (2006), the Hawai'i Supreme Court held:

"Deceptive" acts or practices violate HRS § 480–2, but HRS ch. 480 contains no statutory definition of "deceptive." This

court has described a deceptive practice as having "the capacity or tendency to mislead or deceive," *United States Steel Corp.*, 82 Hawai'i at 50, 919 P.2d at 312, 313[.]

... The Federal Trade Commission (FTC), in *In re Cliffdale Assocs., Inc.*, 1984 WL 565319, 103 F.T.C. 110 (1984), developed a three-part analytical test for "deception," which the federal courts have thereafter extensively adopted, *see FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006); *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir.2003); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir.1994); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988). Under the *Cliffdale Assocs.* test, a deceptive act or practice is "(1) a representation, omission, or practice[ ] that (2) is likely to mislead consumers acting reasonably under the circumstances [where] (3)[ ] the representation, omission, or practice is material." *Verity Int'l*, 443 F.3d at 63. A representation, omission, or practice is considered "material" if it involves " 'information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.' " *Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C.Cir. 2000) (quoting *Cliffdale Assocs.*, 103 F.T.C. at 165); *see also Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir.1992); *FTC v. Crescent Publ'g Group, Inc.*, 129 F.Supp.2d 311, 321 (S.D.N.Y.2001); *FTC v. Five–Star Auto Club, Inc.*, 97 F.Supp.2d 502, 529 (S.D.N.Y.2000); *FTC v. Sabal*, 32 F.Supp.2d 1004, 1007 (N.D.Ill.1998). Moreover, the *Cliffdale Assocs.* test is an objective one, turning on whether the act or omission "is likely to mislead consumers," *Verity Int'l*, 443 F.3d at 63, as to information "important to consumers," *Novartis Corp.*, 223 F.3d at 786, in making a decision regarding the product or service.

Given our obligation under HRS §§ 480–3 and 480–2(b) to apply federal authority as a guide in interpreting HRS ch. 480, we hereby adopt the three-prong *Cliffdale Assocs.* test in determining when a trade practice is deceptive.

. . . .

The application of an objective "reasonable person" standard, of which the *Cliffdale Assocs.* test is an example, is ordinarily for the trier of fact, rendering summary judgment "often inappropriate." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 107, 839 P.2d 10, 24 (1992), *cited in Casumpang v. ILWU Local 142*, 108 Hawai'i 411, 425, 121 P.3d 391, 405 (2005); *Arquero v. Hilton Hawaiian Village LLC*, 104 Hawai'i 423, 433, 91 P.3d 505, 515 (2004). "Inasmuch as the term 'reasonableness' is subject to differing interpretations, it is inherently ambiguous. Where ambiguity exists, summary judgment is usually inappropriate because 'the determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable [minds] might differ.' " *Amfac, Inc.*, 74 Haw. at 107, 839 P.2d at 24 (quoting *Bishop Trust Co. v. Cent. Union Church*, 3 Haw.App. 624, 628–29, 656 P.2d 1353, 1356 (1983)). Reasonableness can only constitute a question of law suitable for summary judgment " 'when the facts are undisputed and not fairly susceptible of divergent inferences' because '[w]here, upon all the evidence, but one inference may reasonably be drawn, there is no issue for the jury.' " [*Amfac, Inc.,*] 74 Haw. at 108, 839 P.2d at 24 (quoting *Broad & Branford Place Corp. v. J.J. Hockenjos Co.*, 132 N.J.L. 229, [232–33,] 39 A.2d 80, 82 (1944) (brackets in original)). " '[A] question of interpretation is not left to the trier of fact where evidence is so clear that no reasonable person would determine the issue in any way but one.' " [*Amfac, Inc.*, 74 Haw.] at 108, 839 P.2d at 24 (quoting *Restatement (Second) of Contracts* § 212 cmt. e (1981) (brackets in original)). *See also Restatement (Second) of Contracts* § 212(2) (1981 and Supp.2005) ("A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or *on a choice among reasonable inferences to be drawn from extrinsic evidence.*") (Emphasis added.) *Id.* at 261–63, 141 P.3d at 434–36 (footnotes and ellipsis in original omitted).

HRS § 480–13 (1993) provides in relevant part:

§ 480–13 **Suits by persons injured; amount of recovery, injunctions.**

. . . .

(b) Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480–2:

(1) May sue for damages sustained by the consumer[.]

. . . .

(c) The remedies provided in subsections (a) and (b) shall be applied in class action . . . lawsuits or proceedings[.]

■■■ "Thus, § 480–13 establishes four essential elements: (1) a violation of chapter 480; (2) injury to plaintiff's business or property resulting from such violation; (3) proof of the amount of damages; and (4) a showing that the action is in the public interest or that the defendant is a merchant." *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 617, 607 P.2d 1304, 1311 (1980), *overruled on other grounds by Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co., Inc.*, 91 Hawai'i 224, 982 P.2d 853 (1999).

Clearly, to litigate a UDAP claim based on Chapter 480, the parties would have had to apply a number of legal standards to the facts in this case, which they did not do. For that reason, we hold that the parties did not actually litigate the issues Plaintiffs moved to add in their proposed second amended complaint.

Given the foregoing, the circuit court did not abuse its discretion by denying the Motion to Amend Complaint.

## C. Certification of subclass

Tokuhisa maintains the circuit court reversibly erred and abused its discretion by certifying an arbitrarily narrow sub-class of VTR consumers who used credit sales contracts and "alleged" that the VTR is insurance. Given our holding that the circuit court did not err by granting Cutter's Motion for Partial SJ or abuse its discretion in denying the Motion to Amend Complaint, we need not address this issue.

## IV.

The Final Judgment filed on June 21, 2007 in the Circuit Court of the First Circuit is affirmed.

Dissenting and Concurring Opinion by WATANABE, J.

I respectfully dissent from Part III.A. of the majority's opinion, which concludes that the Vehicle Theft Registration systems (VTRs) sold by Defendants–Appellees Cutter Management Co.; Cutter Motor Cars, Inc.; Cutter Dodge, Chrysler, Plymouth, Jeep of Pearl City, Inc. dba Cutter Dodge Chrysler Plymouth Jeep of Pearl City; Cutter Dodge Inc.; Rainbow Chevrolet, Inc.; Cutter Ford, Inc.; Cutter Imports, Inc.; Cutter of Waipahu, Inc.; Cutter Pontiac, Buick, GMC of Waipahu Inc. (collectively, Cutter); Red Swan, Incorporated (Red Swan), and Safe–Guard Products International, Inc. (Safe–Guard) (collectively, Defendants) do not constitute insurance.

Under the Hawai'i Insurance Code, which is codified at Hawaii Revised Statutes (HRS) chapter 431, "[n]o person shall transact a business of insurance in this State without complying with the applicable provisions of this code." HRS § 431:1–101 (2005). The term "[i]nsurance" is defined as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies." HRS § 431:1–201 (2005). The "[t]ransaction of an insurance business" is further defined as

any of the following acts in this State effected by mail or otherwise by or on behalf of an insurer . . . .

(1) The making of or proposing to make, as an insurer, an insurance contract;

(2) The making of or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety;

(3) The taking or receiving of any application for insurance;

(4) The receiving or collection of any premium, commission, membership fees, assessments, dues or other con-

sideration for any insurance or any part thereof;

(5) The issuance or delivery of contracts of insurance to residents of this State or to persons authorized to do business in this State;

(6) The transaction of any kind of insurance business specifically recognized as transacting an insurance business under this code; or

(7) The transacting or proposing to transact any insurance business in substance equivalent to any of the foregoing in a manner designed to evade the provisions of this code.

HRS § 431:1–215 (2005). Those who transact any insurance business in Hawai'i are subject to the regulatory oversight of the state insurance commissioner. HRS chapter 431 (2005 & Supp.2008). They are required to deposit and maintain, in a federally insured financial institution within the State of Hawai'i, paid-up capital stock or unimpaired

surplus in amounts specified by statute. HRS § 431:3–205 (2005), 431:3–206 (2005), 431:3–208 (2005), and 431:3–209 (2005). Additionally, they must submit annual and quarterly financial statements, HRS § 431:3–301 (2005), and are subject to annual audits. HRS § 431:3–302.5 (2005). These requirements protect the public interest and provide some protection that funds will be available to fulfill an insurer's obligations under an insurance contract.

Here, Plaintiffs paid between $169 to $399 to purchase a VTR for their vehicles, on the representation that the VTR is "an effective deterrent against vehicle theft." The contracts for the sale of the VTRs expressly stated that "[i]n the event the [VTR] ... fails to deter theft and the described vehicle herein is stolen and not recovered within thirty (30) days," a specified amount ($1,500 or $2,500) will be paid to "the registered owner ... towards the replacement of another comparable vehicle[,]" provided that the purchaser complied with all the conditions[1] specified

---

1. The VTRs, which were marketed as a "three (3) year limited anti-theft warranty," were subject to the following conditions:

1. Parties: This warranty, which is not an insurance policy, is between Vehicle Theft Administrator (VTA) and you, the original owner of the registered vehicle listed herein.

2. Terms: This warranty shall be in effect for three (3) years from the date of installation of the VTR window Etch System, or for Five (5) years from the date of installation if the SI (starter interrupt) option is selected (as shown on front of warranty form), whichever is applicable. A total benefit of $1,500 (VTR only), or $2,500 (VTR/SI combination) will be paid should your vehicle be stolen and not recovered within thirty (30) days, as follows:

3. Benefit: If the selected VTR system, or VTR/SI combination fails to prevent the theft of the vehicle listed in the registration and said vehicle is stolen within three (3) years (VTR only), or within five (5) years (VTR/SI combination) from the date of installation, and not recovered within thirty (30) days, VTA will pay the registered owner either $1,500 (VTR only) or $2,500 (VTR/SI combination), towards the purchase of a similar replacement vehicle.

Note: If the registered vehicle is stolen within three (3) years (VTR only) or five (5) years (VTR/SI combination), and is recovered within thirty (30) days, VTA will reimburse the registered owner 50%, up to a maximum of $ 500 towards your insurance deductible.

Note: This warranty shall become null and void, if any part of the VTR, or VTR/SI is altered, modified or damaged by the customer.

In order to qualify for these benefits, the following conditions must be met.

1. If the registered vehicle is stolen, the original registered owner must notify VTA within thirty (30) days of the actual date of loss. Failure to do so will cause the warranty to become null and void.

2. The original registered owner must have comprehensive insurance in force at the time of theft of said vehicle.

**In addition, you must present the following to VTA.**

3. If filing a non-recovered theft claim, proof of purchase of another similar replacement vehicle must be completed within 120 days from the date of loss.

4. Copy of police report filed within thirty (30) days from the date of loss.

5. Copy of insurance claim report filed within thirty (30) days from the date of loss.

6. Copy of paid insurance claim (theft damage only), or paid insurance claim of at least $2500, total loss payoff and all issued code keys (non-recovered theft claim).

7. Copy of your warranty.

Note: Should you experience a loss which may be covered by this warranty, you must immediately contact VTA at the number shown below for specific instructions for filing a claim.

Note: No benefit shall be conferred by this warranty if you, or someone to whom you have entrusted or given your vehicle participate in or is the cause of the vehicle being stolen.

4. Transfer: This warranty may be transferred to a second owner, one time only. The new owner must re-register the vehicle with

in the applicable VTR contract. Since the VTR contracts expressly required payment of "a specified amount upon determinable contingencies[,]" HRS § 431:1–201, I believe that the VTRs sold by Defendants squarely fell within the definition of insurance.

The majority's opinion relies partly on *Pope v. TT of Lake Norman, LLC*, 505 F.Supp.2d 309 (W.D.N.C.2007). In *Pope*, the United States District Court for the Western District of North Carolina held that Etch, the window-etching product sold to the plaintiffs by the defendant for $349, was a warranty under N.C. Gen.Stat. § 58–1–15(b), a statute unique to North Carolina, which provided that

> [a]ny warranty made solely by a manufacturer, distributor, or seller of goods or services *without charge* … that guarantees indemnity from defective parts, mechanical or electrical breakdown, labor, or any other remedial measure, including replacement of goods or repetition of services, shall not be a contract of insurance under Articles 1 through 64 of this Chapter[.]

*Id.* at 311 (emphasis added). According to the *Pope* court, Etch met the requirements of a warranty because Etch "includes a guarantee to pay $5000 in the event it fails to deter theft of the car (which falls under the 'any other remedial measure' provision in § 58–1–15(b))[,]" "[t]here is no allegation of an additional, dedicated price for the guarantee[,]" and "the payment is offered by Fidelity, which [the plaintiffs] allege is also the seller of Etch." *Id.* at 312. Referring to the

Etch form, which provided "that for three years from the date of purchase, if the vehicle is stolen and not recovered within thirty days, the purchaser is entitled to a Limited Warranty benefit of $5000[,]" *id.*, the court held that "Etch fits squarely within § 58–1–15(b)'s definition of a warranty." *Id.* The *Pope* court also observed that it is a "well-settled principle that a warranty covers defects in the article sold while insurance indemnifies against damage from perils outside the article[,]" *id.* (quotation marks omitted), and then concluded as follows:

> In this case, it is clear that Etch's limited warranty protects customers in the event the product fails as a theft deterrent. Accordingly, to the extent that [the plaintiffs'] claims are based upon their allegations that Etch is insurance, these claims are dismissed.

*Id.*

The holding in *Pope* confuses me because it rests partly on the finding that "[t]here is no allegation of an additional, dedicated price for the guarantee[,]" *id.*, although it appears to be undisputed that the *Pope* plaintiffs were charged $349 for the Etch product. I also have difficulty with the *Pope* court's conclusion that Etch was a warranty and not insurance, since Etch clearly indemnified against damages incurred, not because the purchased Etch product was defective and needed repair or replacement, but because Etch failed to deter theft, by a third party, of a vehicle on which Etch was installed, as the Etch manufacturers had guaranteed.

VTA, within thirty (30) days of the date of transfer. There is no transfer fee, and the new owner is entitled to coverage for the remainder of the original warranty term.

5. Renewal. This warranty may be renewed by original owner at no charge by contacting VTA, at the number shown below. Contract may be renewed only within thirty (30) days of expiration.

6. If the registered owner is involved in a collision or other occurrence involving damage to your windows, the customer must notify VTA, (A) within thirty (30) days of such occurrence, or (B) within thirty (30) days of completion of repairs, whichever (A) or (B) occurs first. If notice is not given, then this warranty shall automatically become null and void. If VTA is notified within the said time period, then the authorized VTR auto dealer must in-

spect the vehicle, to determine that the replacement and re-etching was completed.

7. Incidental and consequential damages excluded-customer shall not be entitled to recover from VTA, the successors or assigns, any consequential damages, damage to property, damages for loss of use, loss of time, loss of profits, or income, or any other incidental damages.

8. This warranty agreement gives you specific legal rights and you may also have other rights which vary from state to state.

**VEHICLE THEFT ADMINISTRATOR**
**P.O. BOX 893643**
**MILILANI, HI 96789**
**MAINLAND 1–800–922–7862/HAWAII**
**(808)623–2784**

In this case, Defendants, by selling the VTRs, did not merely offer to replace a defective window etching or refund the initial purchase price for the VTR. Rather, Defendants offered to pay $1,500 or $2,500, an amount far in excess of the $169 to $399 purchase price, if theft of a vehicle for which a VTR had been purchased occurred, provided the conditions spelled out in the VTR contracts were met. I would hold that the VTRs were clearly insurance under the Hawai'i Insurance Code, vacate that part of the circuit court's order granting Defendants' motion for partial summary judgment, and remand for further proceedings.